

1         **IN THE UNITED STATES DISTRICT COURT**
          **SOUTHERN DISTRICT OF FLORIDA**
2

            **MIAMI DIVISION**
3
        **CASE NO.:  16-cv-24687-KMW**
4

5

6

7  EDGARDO LEBRON,               )
                        )
8       Plaintiff,       )       October 11, 2017
                        )
9                         )
  ROYAL CARIBBEAN CRUISES LTD,  )      Pages 1 - 48
10                         )
       Defendant.       )
11  _____/

12

13

14
                DISCOVERY HEARING
15
     BEFORE THE HONORABLE ANDREA M. SIMONTON
16        UNITED STATES MAGISTRATE JUDGE

17

18

19

20
  APPEARANCES:
21

22  On behalf of Plaintiff:

23                ARONFELD TRIAL LAWYERS
               3132 Ponce De Leon Boulevard
24               Coral Gables, FL 33134
               BY:  MATTHIAS M. HAYASHI, ESQ.
25

```
 1   APPEARANCES CONTINUED:

 2
     On behalf of the Defendants:
 3
                         FOREMAN FRIEDMAN, P.A.
 4                       2 S Biscayne Boulevard
                         Suite 2300,
 5                       One Biscayne Tower
                         Miami, FL 33131
 6                       BY:  DARREN W. FRIEDMAN, ESQ.

 7

 8
     Transcribed By:
 9
                         BONNIE JOY LEWIS, R.P.R.
10                       7001 SW 13 Street
                         Pembroke Pines, FL  33023
11                       954-985-8875
                         caselawrptg@gmail.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   (Thereupon, the following proceeding was held:)

2          THE COURT:  Good morning.  Please be seated.

3          THE COURTROOM DEPUTY:  Calling Case Number 16-24687

4    civil Judge Williams; Edgardo Labron versus Royal Caribbean

5    Cruises LTD.

6          Counsel, would you please note your appearances for

7    the record.

8          MR. HAYASHI:  Yes.  Matt Hayashi with Aronfeld Trial

9    Lawyers for the Plaintiff Edgardo Labron.

10         THE COURT:  Thank you.

11         MR. FRIEDMAN:  And good morning, Your Honor.  Darren

12   Friedman on behalf of the Defendant.

13         THE COURT:  Okay.  Thank you.

14         We are here today for a discovery hearing on about a

15   thousand issues between the parties with, I think, our 85th

16   discovery hearing in this case.

17         I speak hyperbolically, of course, but there are a

18   number of discovery requests.  You all have been here on a

19   number of occasions.

20         I want to start by asking the Plaintiff to provide me

21   with the information that has developed to date regarding

22   refrigeration equipment.

23         Your expert affidavit says nothing about how it would

24   be relevant to the events that would occur on this ship with

25   respect to Mr. Lebron's ice skating.  All it says is that he

1  wasn't allowed to inspect the equipment.  And I think we dealt

2  with that somewhat at the last hearing in terms of the

3  inspection.

4       So, Mr. Hayashi, why don't you explain that to me.

5       MR. HAYASHI:  Okay.  Would you like me to send --

6  because I believe this is discussed in his report.  Would you

7  like me to send it to you, or just discuss it, or both?

8       THE COURT:  This is not the time to be sending expert

9  reports to me ten minutes -- we are a little late on our

10 discovery hearing.  Our other discovery hearings ran over so we

11 are about ten minutes late.  And we're about ten minutes late,

12 but the source materials are the source materials.

13      I know you sent me a deposition at 11:45 last night,

14 you know, as source materials for the hearing this morning, Mr.

15 Hayashi, but I want you to give me the information you have

16 that leads you to believe that the refrigeration equipment

17 contributed to the fall of Mr. Lebron.

18      At the last hearing I think you mentioned, for

19 example, that you believed his fall was caused because he was

20 skating when the thrusters were operating.  When it appears at

21 this point, undisputed, that the trusters they were not just

22 leaving the port.  The trusters were not operating.

23      Your argument led me to order, you know, pretty broad

24 discovery on that basis which you received, at least to some

25 extent.  So now, you advance some theory, I imagine, that the

1  refrigeration equipment contributed to the fall.  So I would

2  like an explanation of that.

3          MR. HAYASHI:  Absolutely Your Honor.

4          Just about the stabilizer fins.  Our client did inform

5  us that he did believe the ship was leaving port at the time,

6  but we understand your concern.

7          As to the refrigeration unit, our expert indicates

8  that when he investigated the -- when he performed the ship

9  inspection, he noticed that the ice was soft and wet.  And it

10 is our expert's opinion that the ice should not have been in

11 this condition.

12         And one way the ice can be in this condition is that

13 the temperature may not have been as low as it is should have

14 been.  And our expert indicates that the temperature did not

15 feel as cold as he would have expected.

16         And to that effect, our expert requested to

17 investigate the refrigeration unit, not just the control panel.

18 And Defense counsel or Defendant make a big deal out of the

19 piping, but I have actually spoken to Mr. McLaughlin.  And

20 although he, perhaps, would like to he says it is not essential

21 that he inspect the piping.

22         So we are fine not to go into in that.  However, he

23 did want to see -- I think it's called the control room.  I

24 forget the exact term, but there's a part of the ship where the

25 piping leads to.  There is a refrigeration unit that the piping

1  connects the rink to this refrigeration unit.

2          And our expert requested to inspect this area and this

3  was something that we brought up as something that our expert

4  wanted to inspect at the previous discovery hearing, but our

5  expert was not allowed to inspect.

6          THE COURT:  Okay.

7          MR. HAYASHI:  And I meant the one before the previous

8  one.  Excuse me.

9          THE COURT:  Right.

10         And that hearing, two hearings ago, what I said is the

11  inspector needs to be allowed to examine any accessible part of

12  the ship where the refrigeration equipment is located.

13         And I also said, at your request, that the rink needed

14  to be iced over.  In other words, it needed to be in ice

15  skating condition for the inspection.  You couldn't have the

16  Quest, you know, the dance floor put over the ice skating rink.

17         And then, at the last hearing, he needed to many

18  incident effect the piping.  And the argument was, well, the

19  piping, you know, we couldn't defrost the rink for him to

20  conduct the inspection and that was not requested and it wasn't

21  ordered.

22         And so I think that's, in an sense, I think that's

23  where we left it.  There was a request for sanctions because he

24  didn't do the inspection that, you know, took enough time.  And

25  we went back and forth and I said no sanctions on the

1    Plaintiff.  He is entitled to spend as little time as he wants.

2    He is still entitled to examine the boat.  And if he didn't

3    take advantage of the full opportunity, then, so be it.

4         And the only issue that I understood was at issue was

5    that in order for him to conduct whatever additional inspection

6    he wanted to conduct, it would have required defrosting the ice

7    rink, which simply was not feasible and had not been requested.

8    And in fact, the contrary was requested.

9         So we are back here, yet, again.  And I need you to

10   tell me exactly what it was and how the inspection should have

11   occurred that it didn't occur with respect to the refrigeration

12   equipment.

13        MR. HAYASHI:  Absolutely, Your Honor.

14        Just so the record is clear, our expert does not need

15   to inspect the piping.  The issue is there is a room that the

16   piping is connected to.  The piping runs from the rink to a

17   room where there is the refrigeration equipment, which should

18   include the model, the make number, and it should include a

19   machine that's cooling the ice.

20        THE COURT:  Right.  And that's what he was allowed to

21   inspect.

22        MR. HAYASHI:  Actually, Your Honor, he was not allowed

23   to inspect this room.  He was allowed to inspect the control

24   panel, which is not in this room.  And it was our understanding

25   that he should have been allowed to inspect this room and it is

1   our position that we should be allowed to inspect this room.

2          THE COURT:  Okay.  So let me ask Mr. Friedman.

3          At that hearing I specifically said he's allowed to

4   look at the refrigeration equipment.  He's allowed to look at

5   the model.  He's allowed to look at whatever manuals are there

6   and he's allowed to look at the rink that's iced over.

7          And what happened, from your perspective?  I might

8   need an evidentiary hearing on this.

9          MR. FRIEDMAN:  Sure.

10          First, in terms of timing, Your Honor, if you may

11   recall, that hearing took place on the day that our attorney

12   was actually en route to the ship.

13          THE COURT:  Correct.

14          MR. FRIEDMAN:  So there was a little bit of a

15   communication issue there.

16          When she got to the ship, when all the attorneys got

17   to the ship, what we learned is you have the rink itself.  You

18   have the control room.

19          Then, you have the layer of ice.  So underneath the

20   layer of ice you have the sand and under that you have the

21   piping.  He was allowed to see the ice.  He was allowed to see

22   the control room.  He was allowed to see all the panels,

23   et cetera.

24          The actual machine, the compressor, I guess, that

25   pushes the water through the compressor up through the pipes

1  into the ice is actually buried deep within the engine room of

2  the ship and that is not an accessible area of the ship.  That

3  is an area that the ship doesn't allow anyone to be in because

4  it is really unsafe for anyone to be in the engine room, as you

5  can could imagine.

6          And so when they came on board, learned of the

7  discussion that happened, the ship looked at all the lawyers

8  and said there's no way we're letting anybody in the engine

9  room.  It's not safe.  We can't allow anyone in there because

10  it is dangerous to them and that's what happened.

11          And then, I would say to the Court, one, it's crazy to

12  allow -- and I apologize for the use of that word, but a second

13  inspection for refrigeration because it has nothing to do with

14  the case.  Never mind the fact that it is not safe to go down

15  there.

16          If they want, I have not problem telling them the make

17  or the model, but to allow someone into a dangerous situation

18  into the engine room, another trip back to Puerto Rico to

19  inspect this when it has nothing to do with the issues in the

20  case, I would suggest that that is generally a waste of

21  everybody's time.

22          In terms of what their expert himself said, I can't

23  help but note again, his expert's opinion is the room felt warm

24  to me.  They actually took measurements with actual

25  thermometers as opposed to feelings, which showed that

1   everything was set to the proper temperature and there is no

2   argument about that.  But their whole reasoning for we have to

3   go down into the bowels of the ship to see the machine that's

4   in the engine room is because of his feeling that it seemed too

5   warm.  To me that doesn't warrant a second inspection.

6        THE COURT:  Okay.  And Mr. Hayashi, he has the

7   temperatures of the room at the time?

8        MR. HAYASHI:  I'm not sure, but I don't believe that

9   he actually took the temperature.

10        However, he did note that the ice was soft and it was

11   wet.  And that's why he wanted to inspect the compressor.  I

12   believe that's what it is called.

13        MR. FRIEDMAN:  If I may, Your Honor, ice is always

14   wet.

15        MR. HAYASHI:  Well, it was unusually soft, Your Honor.

16        THE COURT:  Okay.

17        MR. HAYASHI:  And really wet.

18        MR. FRIEDMAN:  I would also note, Your Honor, however

19   it may have been on that day says nothing about what it would

20   have been a year and-a-half plus on the date of the actual

21   incident.  I'm happy to provide the name of the machine, the

22   make, the model.  That may have already been produced.  I'm not

23   certain.

24        THE COURT:  You objected to their bit request for

25   production, which actually asked for production for all of that

1  information among other things.

2         MR. FRIEDMAN:  And I will happily give the name of the

3  make and the model of that equipment.  I don't see the

4  relevance to it, but if it is that versus paying for everyone

5  -- it would be our fourth trip to Puerto Rico in this case

6  which is probably not the easiest place to get to right about

7  now.

8         THE COURT:  Are you still sailing into Puerto Rico?

9         MR. FRIEDMAN:  They are going in and out because

10 they're running rescue missions right now.  I couldn't tell you

11 right now where this specific vessel is then.

12        THE COURT:  So it may not be on the Puerto Rico run;

13 is that correct?

14        MR. FRIEDMAN:  I don't know.

15        THE COURT:  It could be still sitting at the dock in

16 Miami.

17        MR. FRIEDMAN:  I don't know where this specific vessel

18 is today.

19        THE COURT:  And what inspecting this machine tell him?

20 What will a visual inspection of this machine tell him, Mr.

21 Hayashi?  I don't see a --

22        MR. HAYASHI:  Yes, Your Honor.

23        When speaking to Mr. McLaughlin, he indicated that

24 depending on the age of the machine if there was rust, like

25 what state of repair or disrepair the machine was in that could

1    give him an idea of whether or not the machine might have been

2    a cause and a factor of the ice being unusually soft and wet.

3            MR. FRIEDMAN:  Again, Your Honor, how it is today says

4    nothing but how it was then.

5            I would also point out to the Court because I am just

6    envisioning further hearings down the road --

7            THE COURT:  No.  Actually, I'm not having any further

8    hearings on this case.

9            Anything else that needs to be brought to my

10   attention, I want a written motion.  And I am going to use an

11   expedited briefing schedule on it because, you know, this case

12   is -- I think the case is being over litigated in a lot of

13   respects.  I think there is just a failure to agree on things.

14           Mr. Friedman, when I was here before, whoever was here

15   -- I don't remember who was here at that hearing.  You know, I

16   said, well, what's the problem with letting them examine the

17   refrigeration equipment?  No problem.

18           You're now saying, well, that's because the person who

19   was here didn't know that the refrigeration equipment that he

20   wanted to inspect was located in an inaccessible area.

21           Why is it inaccessible?  It is inaccessible because it

22   is dangerous.  Well, I could certainly understand why you

23   wouldn't want people unfamiliar with engine rooms going down

24   there, but presumably their expert is familiar with engine

25   rooms.  I mean, he's a maritime expert.

```
 1            MR. FRIEDMAN:  He's not.

 2            THE COURT:  He isn't a maritime expert?

 3            MR. FRIEDMAN:  No, he's an expert at constructing ice

 4    skating rinks.  My guess is he knows nothing about engine rooms

 5    and ships.

 6            MR. HAYASHI:  Well, correct.

 7            He is an ice skating rink manager or he is an expert

 8    in the construction of ice skating rinks.

 9            THE COURT:  Okay.  I mean, I have been in engine

10    compartments of actually very tiny engine compartments of

11    ships.  And you have to be very careful when you are there, but

12    nevertheless, they can be inspected.

13            I don't know why your client fell.  I mean, your

14    client has had various theories about why he fell, but what I

15    am going to do is and it would seem -- it seems to me one thing

16    I am concerned about is that this discovery is eating away in

17    terms of the proportionality of the discovery versus the nature

18    of the claims.

19            What was the computation of damages for Mr. Lebron?  I

20    know he hurt his ankle, but I don't really know.

21            MR. HAYASHI:  Let me look at our responses to their

22    interrogatories.  I will just pull this up.

23            And I am not sure that the Defendant asked for a

24    computation of damages.

25            THE COURT:  Well, Rule 26 requires that you provide
```

1  one.

2          MR. HAYASHI:  Well, let me look at the initial --

3          THE COURT:  It's without request and updated as

4  appropriate.

5          MR. HAYASHI:  I apologize, Your Honor.

6          But I will have to look into this more because I can't

7  seem to find this.

8          THE COURT:  And the nature of his injury was?

9          MR. HAYASHI:  He had a -- his ankle was fractured, I

10  believe.  And it required extensive surgery and it was a pretty

11  bad injury, Your Honor.

12          THE COURT:  And in this terms of his work?

13          MR. HAYASHI:  Yes, it says that he missed days of

14  work.

15          THE COURT:  How many days?

16          MR. HAYASHI:  Let me pull up the responses.  Excuse

17  me, Your Honor.

18          THE COURT:  So the bottom line, Mr. Hayashi, you

19  cannot tell me the value of your case, the economic value of

20  your case?

21          MR. HAYASHI:  Well, I believe it is over $100,000,

22  Your Honor, just from some familiarity with the case.

23          THE COURT:  Mr. Friedman, what is the Defendant's

24  estimate of the value of the Plaintiff's value of the case?

25          Now the Defendant's value is zero and I understand.

1       MR. FRIEDMAN:  Your Honor, you are asking me to assess

2  assuming there is liability and what I would value the case at.

3       THE COURT:  Well, I don't know if you've had

4  discussions with other folks in Mr. Hayashi's office.  Not in

5  terms of settlement discussions, but just in terms of the

6  damages they're claiming, since Mr. Hayashi doesn't seem to

7  know what damages they're claiming.

8       MR. FRIEDMAN:  I have not.

9       THE COURT:  I didn't know if you knew what damages

10 they were claiming even though they hadn't --

11      MR. FRIEDMAN:  Well --

12      THE COURT:  -- been put forth in a Rule 26 disclosure

13 or something like that.  That's what I meant.  I don't want you

14 to value their case.

15      MR. FRIEDMAN:  Understood.

16      THE COURT:  I mean, that's --

17      MR. FRIEDMAN:  Generally, my understanding is it was

18 an ankle fracture.  It was surgically repaired.  I do believe

19 he missed a little time off work, but now I've met the

20 individual on multiple occasions.  He's back to work.  He

21 doesn't have any limp or permanent issues.

22      My understanding is his ankle injury has fully

23 resolved.  I would certainly suggest that the cost of the

24 experts and the cost of the various trips that we've taken has

25 probably exceeded the value of the case already.

1    THE COURT:  Well, one never knows about pain and

2    suffering and how a jury is going to value that.

3    MR. FRIEDMAN:  Very true.

4    THE COURT:  Okay.

5    MR. HAYASHI:  And I have an answer to the number of

6    days missed, Your Honor.

7    THE COURT:  Okay.

8    MR. HAYASHI:  It says here approximately 90 days.

9    THE COURT:  Okay.  What does he do?

10   MR. HAYASHI:  He is a manager for, I believe, Sears.

11   THE COURT:  Okay.  So here's what I am going to

12   require.  I am going to require the Defendant to respond to the

13   RFPs regarding the refrigeration equipment.

14   And at this time, I am not allowing an additional

15   inspection.  And that's due to the inaccessibility issues,

16   however, and the lapse in time between the accident and today.

17   And also, basically, the lack of evidence to indicate,

18   that has been presented to me, to indicate that the

19   refrigeration equipment could have contributed to the

20   Plaintiff's fall.

21   If the Plaintiff seeks to have this second inspection

22   after receiving the information and presenting it to its

23   expert, Plaintiff can file a motion after consulting with the

24   Defendant.

25   And I would expect any motion must be supported by an

1   expert's affidavit.  And not the affidavit that you gave me

2   that said I wanted to look at refrigeration equipment in pipes

3   and wasn't allowed to do so.  And so any response would also be

4   supported by an affidavit explaining why inspection is not

5   feasible.

6           Okay.  Now, I am going to turn to the Defendant's

7   notice of hearing, since you filed your notice first, and I

8   will get to whatever it is we can get to.  I think that it

9   makes sense to first deal with the -- and I know this was also

10  part of Plaintiff's notice, the e-mail and telephone numbers

11  for the 108 passengers.

12          And I will just say, at the outset, it seems to me

13  that the request for e-mail and telephone numbers for all of

14  these people is overbroad because the description of some of

15  them -- and I just briefly glanced through the list is clearly

16  not relevant to the Plaintiff's claim.

17          I bumped into somebody and I fell, for example.  I

18  don't see where somebody cut me off ice skating.  I don't see

19  how those incidents could, by any stretch, be relevant to Mr.

20  Lebron's claims, but you can explain why.

21          But since it is the Defendant's notice of hearing, I

22  will let the Defendant tell me, you know, why it is that those

23  e-mail addresses and phone numbers should not be provided.  I

24  noted that you did provide physical addresses for the

25  passengers.  I am not sure why at the same time you didn't

1   provide e-mail addresses and telephone numbers.

2           You know, that looks to me like -- and I want you to

3   explain why.  It looks like it was a conscious decision not to

4   do that because I think the same place you would get the

5   physical addresses would also have e-mail addresses and

6   telephone numbers if known.

7           So, Mr. Friedman, why don't you tell me that.

8           MR. FRIEDMAN:  Okay.  Well, two things, Your Honor.

9           First of all, certainly not a conscious decision.

10  What I relayed was the exact information as it was given to us

11  from the client.

12          THE COURT:  No, but I am saying a conscious decision

13  on the part of the client.  I am not saying a conscious

14  decision --

15          MR. FRIEDMAN:  I understand.

16          THE COURT:  -- on the part of the attorney.

17          MR. FRIEDMAN:  Sure.  And I can't answer it today

18  because I simply presented the information as it was presented

19  to us.

20          So I don't know whether or not e-mails or phone

21  numbers are kept on a different screen, or a different page, or

22  a different database.  I simply don't have that answer today.

23  The only answer I have is we presented the information as it

24  was given to us, but in terms of the issue of why we don't

25  believe production should be made at all, it is twofold, both

1    of which you have already touched upon.

2          One is that it is simply overbroad to ask for all this

3    information now because as you touched upon many of these

4    people have nothing -- it wouldn't be substantially similar.

5    It wouldn't be information that would eventually be admissible.

6    It wouldn't be any information that could potentially support

7    any of the claims of the Plaintiff.

8          And then, additionally, Your Honor, as you noted

9    originally when there was a discussion concerning prior

10   incidents, the Court was going to limit that discovery to this

11   specific ship because the Court had noted, the ice, this

12   specific ship, this specific location could be different than

13   other vessels.

14         And Plaintiff raised this theory, I think their eighth

15   different theory of how this accident may have occurred that

16   concerned the bow thrusters and leaving the port.  And so Your

17   Honor said, well, then I could understand why other ships might

18   be relevant because this may be sort of a systemic issue

19   occurring on all the vessels.

20         Now that this has ruled out and now that we have

21   learned that Mr. Lebron's accident occurred two hours after

22   leaving port, I would go back to what Your Honor originally

23   suggested, which would be just prior incidents occurring on

24   this specific vessel.

25         And I would suggest that if that limitation were going

1  to be made, and we can narrowly focus this, then I would ask my

2  client to provide that more detailed contact information for

3  those specific incidents that might lead to show something.

4       I'm not sure, as we sit here today, what is the

5  purpose of any of this discovery, though.  I will plainly admit

6  to you today that lots of people fall while ice skating.  It is

7  sort of a known risk of strapping a blade to your foot and

8  going on ice.

9       So I don't understand the purpose of the discovery at

10 all.  And I do have a problem with the lawyers in this case now

11 starting to e-mail and call a hundred plus prior guests to ask

12 them about their falling while on the ice.  Unless it is going

13 to do something to contribute to the progress of this case and

14 that's what I fail to see.

15       THE COURT:  Okay.  Mr. Hayashi?

16       MR. HAYASHI:  Yes, Your Honor.

17       First, as to the issue of the descriptions not looking

18 relevant, Plaintiff respectfully submits that in his counsel's

19 experience -- and this was actually something that came up in

20 the *Goins* case.  The descriptions don't always match what the

21 people tell the attorneys when they speak to them.

22       In the *Goins* case, I forgot the name of this person,

23 but one person said that there was -- in the description --

24 said there was a soda can or a beer bottle, I think it was.

25 But when we actually spoke to this person and we took their

1  deposition, they didn't remember that being even there, let

2  alone the cause of their fall, which was being represented in

3  the description.

4       So as to the description, Your Honor, Plaintiff

5  respectfully submits that his attorneys are entitled to inquire

6  deeper than just the Defendant's own investigation.  Not that

7  Defendant is necessarily intending to represent anything, but

8  just how the Defendant describes the incidents is not always

9  how these passengers remember them.

10      Second of all, as to the scope of the discovery, I

11 believe there was more discussion other than just the issue of

12 the ship leaving port and what time it was leaving port.  One

13 issue, I believe, was at Studio B which is essentially the same

14 design and construction across all the ships that it is on.  So

15 I am not so sure why that would be an issue.

16      However, if Your Honor is inclined to limit the

17 discovery of this other contact information, Plaintiff would

18 request at least that all the information be given for the

19 passengers on the Adventures Of The Seas.

20      And well --

21      MR. FRIEDMAN:  Your Honor, I still don't see the

22 point.  They will call a hundred people, take a hundred

23 depositions, and people are going to say, yes, I fell.  I don't

24 get it.  I honestly don't.  I don't see where all of this leads

25 to any admissible evidence.

1        THE COURT:  Okay.  Well, the first thing that I want

2   to do on this is, I want to know why you gave physical

3   addresses and not e-mails and phone numbers.

4        I am troubled by that and I am troubled by the fact

5   that you said you sent the request to my client and this is

6   what they sent back.  I clearly required contact information.

7        And you know, maybe I didn't specifically said all

8   contact information, but I think it is implicit that if you

9   have easily accessible contact information that it should be

10  provided.

11       So I am troubled by your client's decision-making

12  process.  Now, there may be a good reason why they didn't.  I

13  don't know that and I don't know if you have the incident forms

14  with you on any of these.

15       I don't know if the incident form requests that

16  information on the form or not.  I have looked at them.  I am

17  sure you have looked at them.  Maybe you know.

18       MR. FRIEDMAN:  I can't tell you generally that

19  incident forms would not have that information.

20       THE COURT:  Would they have a physical address or

21  would they just have a cabin number?

22       MR. FRIEDMAN:  I believe they would have a physical

23  address.  They would not have a phone number and I can't think

24  of a location for an e-mail either.  They would have a cabin

25  number as well and they would have a physical address.  And

 1  then, that very well may be an explanation.

 2          THE COURT:  And Mr. Hayashi, you have seen your

 3  client's own incident report in this case?

 4          MR. HAYASHI:  Yes, Your Honor.

 5          THE COURT:  And did it have an e-mail address on it or

 6  do you recall?

 7          MR. HAYASHI:  Well, just to make sure that I explain

 8  this accurately, I can pull this up in two seconds and I have

 9  this.  Maybe slightly that two seconds.

10          MR. FRIEDMAN:  And I do know, Your Honor, just in

11  discussions with my client about coming to this hearing today,

12  they were somewhat troubled about having to turn over all this

13  information about other guests.

14          They are concerned about sort of a witch hunt and

15  harassment of their other guests.  And I have had cases before

16  where judges have said the parties will jointly send a letter

17  out to all hundred guests inviting those people to contact the

18  lawyers if they want to give information, as opposed to just

19  providing over e-mails, phone numbers.

20          THE COURT:  And I have had situations where people

21  have requested that also.  This wasn't one of them.

22          MR. FRIEDMAN:  Well --

23          THE COURT:  In any event, I am just saying --

24          MR. FRIEDMAN:  That was one of our concerns in turning

25  over the information is that these individuals have privacy

1  rights.

2          THE COURT:  And I can respect that.

3          Mr. Hayashi?

4          MR. HAYASHI:  Yes, Your Honor.

5          I've located the incident report and it does have the

6  e-mail and the phone number of our client.

7          MR. FRIEDMAN:  I stand corrected, then.

8          THE COURT:  Mr. Hayashi, will you show that to Mr.

9  Friedman?

10          MR. HAYASHI:  Yes, Your Honor.

11          May the record reflect that I am showing it to Mr.

12  Friedman.

13          MR. FRIEDMAN:  This form does.  He's correct.

14          THE COURT:  Okay.  So it seems like it was a conscious

15  decision on your client's part to arbitrarily not include the

16  contact information that was readily available to them.

17          And I didn't require turning over the incident reports

18  because despite the fact that I find that you claim there is no

19  anticipation of litigation that would require you to preserve

20  items -- and this isn't limited to you.  I have the same

21  situation in another case.

22          They say, well, we didn't anticipate litigation and so

23  we didn't feel a need to preserve it.  I am just saying I've

24  had cases -- I mean, it seems like the cruise lines are doing

25  it both ways.  We didn't anticipate litigation and we didn't

1  preserve.  And we did anticipate litigation when we're being

2  required to turn over the incident reports requested on that

3  date.

4      So I'm just saying --

5      MR. FRIEDMAN:  Well, I would certainly --

6      THE COURT:  I'm confused.

7      MR. FRIEDMAN:  I would say in this case we certainly

8  did anticipate litigation.

9      THE COURT:  Okay.

10     MR. FRIEDMAN:  I mean, that's always the contention

11 that I've made in terms of accident reports because we

12 generally know when people fall on their rears on the ice

13 they're probably going to sue over it anyway.  And photographs

14 were taken and video was preserved.

15     THE COURT:  Well, in any event, here's what I am going

16 to do.  In light of the way the case has evolved, it would seem

17 to me that your theory now of the case there was something

18 wrong with the ice on this ship and the refrigeration equipment

19 on this ship that might not have been working well, or the ice

20 may not have been maintained properly on this ship.

21     And so what I am going to do is I am going to limit

22 the e-mail addresses and phone numbers, if known, to the -- I

23 think there were -- let me count them.  I think there were

24 roughly, a little less than 25, but let me make sure.

25     Okay.  To these 22 passengers -- and I will let

1  Plaintiff select eight additional passengers from the sister

2  ships if you think there is something.

3        MR. HAYASHI:  Let me just ask one question, Your

4  Honor.

5        THE COURT:  Yes.

6        MR. HAYASHI:  Correct me if I'm wrong, but my

7  understanding was that not all of these ships are sister ships.

8  I believe these were all ships that had a Studio B.

9        THE COURT:  I am using the term to refer to the other

10 ships, which were provided in response; Explorer Of The Seas,

11 Mariner Of The Seas, Navigator Of The Seas.

12        I thought they were all sister ships, but whatever --

13 Voyager Of The Seas, but whatever the other ships were in

14 response for production number 64, so you can pick eight

15 additional passengers from the other ships.  And the e-mail

16 addresses and phone numbers, if known, with respect to the 22

17 passengers and eight additional passengers from the other

18 ships.

19        And as to the rest -- and I think I am being very

20 generous by allowing any passengers from the other ships

21 because in light of your present theory of the case, I am not

22 sure that any of them would be sufficiently similar to what was

23 occurring on this ship at that time, but it gives you a little

24 bit to explore.  It makes it a total of 30 out of the 108

25 incidents that you will get as an even number.

1    MR. HAYASHI:  May I ask a question, Your Honor?

2    THE COURT:  Yes.

3    MR. HAYASHI:  Yes.  Do you -- excuse me if I was a

4  little confused from the previous hearing, but I believe you

5  said that you have limited authority to grant a discovery

6  extension based on your rulings?

7    THE COURT:  Correct.

8    MR. HAYASHI:  Plaintiff --

9    THE COURT:  I cannot give a -- let me put it this way.

10  If you have set a deposition for the day before the discovery

11  cutoff date and there is an objection to that deposition going

12  forward for whatever reason.  And you want to take it the next

13  week and you set it down for a hearing because you think the

14  deposition should go forward and the other side thinks it

15  shouldn't go forward.

16    Let's say it's an apex deposition and the Defendant is

17  saying the CEO of NCL has no or RCL -- RCL sorry.  The CEO of

18  RCL has no knowledge of this.  And you say, I want that

19  deposition.  I'm setting it for the day before the discovery

20  cutoff.  We've exhausted all of our other means.  And I set it

21  down for a hearing and I say, well, I think the CEO of RCL

22  should be deposed.  I will let him be deposed the week after

23  the discovery deadline.

24    So if there is a specific discovery request and the

25  request is disputed and I make a ruling saying I think you

1  should get that discovery, then, I have limited authority to

2  say this specific item of discovery that was properly requested

3  and should have been produced within the discovery cutoff

4  period, can be extended.  So that's my authority.

5         If it goes beyond that, then that is within the

6  discretion of Judge Williams.  Unless she sends it to me.

7  Sometimes she sends it to me and sometimes she doesn't.

8         And so how much time, Mr. Friedman, do you need to

9  provide both the requests for production, those responses that

10 I have previously ordered, as well as these e-mail addresses?

11        MR. FRIEDMAN:  Can we do 14 days?

12        MR. HAYASHI:  Your Honor, I believe 14 days is just a

13 few days prior to the discovery cutoff.

14        THE COURT:  Okay.  Well --

15        MR. HAYASHI:  I don't believe Plaintiff will have

16 enough time to even set these depositions.

17        THE COURT:  I don't know that you will have enough

18 time no matter what, but if they don't voluntarily respond, but

19 in any event --

20        MR. FRIEDMAN:  Under any scenario he won't be able to

21 timely take depositions.  I also imagine they are going to be

22 moving for an extension to reopen expert disclosures.

23        THE COURT:  Well, I am not sure they will get it, but

24 in any event, the discovery cutoff is October the 27th.  So why

25 don't you do it in seven days.  October the 18th.

1        And in part with respect to the e-mail addresses, it

2   should have been provided before or it should have been, you

3   know, an issue that was raised before me before, but it wasn't

4   so.

5        Okay.  Now, moving along, with respect to the

6   Defendant's notice of hearing, you want a protective order

7   regarding the fifth request for production and a third request

8   for admissions.

9        Okay.  Mr. Friedman.

10       MR. FRIEDMAN:  Yes, Your Honor.

11       Our argument is Plaintiff -- well, one, they are on

12  their fifth request for production.  We have already responded

13  to, I think it is 70 requests for production at this point in

14  terms of admissions.  They're on their third set.  We have

15  already responded to 60 admissions.

16       They're now asking for an additional 130.  If this

17  couldn't be any more of a textbook example of proportionality.

18  It's overbroad.  It is harassing.  It is burdensome.  And just

19  to give some examples, if we were to actually get to the

20  specifics of the case, I don't even understand what they are

21  trying to do.

22       THE COURT:  Well, with respect to the requests for

23  admissions, it seemed to me what they were looking for what

24  they want to know if you are going to agree that these are

25  business records that could be introduced into evidence at

1   trial.

2         And when I looked at them, it looks to me like they

3   have gone through with respect to each of the documents all of

4   the predicates that you would need to introduce a business

5   record.  And so they want to know if it was made, you know, by

6   a person with knowledge.

7         And so my guess is that if the parties got together,

8   which you will have to do in any event prior to the pretrial

9   conference, they will know.  And they will also know prior to

10   the close of discovery if they need to take somebody's

11   deposition.

12         MR. FRIEDMAN:  Here's what I've already told them

13   because we've had these discussions.  I said any document

14   created by my client which is a policy, or procedure, or

15   manual, or anything of that nature, no argument.

16         If it's a document that was produced that is from

17   somebody else, like the manufacturer of the ice skating rink,

18   or the manufacturer of the refrigerator, I can't authenticate

19   it because it is not mine.

20         And then, any document that might be a medical record,

21   I can authenticate that the document came from the ship, if it

22   was the ship's medical record, but I would not agree to

23   admissibility because there might be hearsay statements within

24   the document itself.  And that is the discussion I had with

25   counsel and, nonetheless, we are here.

1      THE COURT:  Okay.  Well, I think you need to answer to

2  the best you can.  I think you need to answer those requests

3  for admissions, then.

4      Because to say that you can't authenticate it doesn't

5  mean that you don't admit that it is authentic.  And as you

6  know, it doesn't have to be your document to agree that it is

7  an authentic document.

8      I mean, you have been at this business for a long

9  time, Mr. Friedman.  There are many documents that there is no

10  question of their authenticity, or that they are business

11  records and they are not your client's.

12      Now I understand why, you know, maybe you don't want

13  to admit it and that's fine, but what that means is that you

14  have to pay for the cost of them proving that up.

15      If there is no genuine dispute and you haven't

16  admitted it, it is like if your client provides a

17  manufacturer's manual regarding your product, no, it is not

18  your document, but do you really contest its authenticity?

19      I mean, give me a break.  Of course you don't.  Unless

20  there is some reason to and there may be a reason to.  And you

21  know, I can't tell because -- and I thank you for this

22  actually.

23      You didn't attach, you know, the 86 pages of exhibits

24  that were attached to the requests for admissions and I thank

25  you for that in one sense, but in the other sense it is hard

1    for me to go really request by request for the admissions.  And

2    so I think that, you know, requests for admissions are

3    generally a way of getting at this.

4          I mean, you could probably agree, you know, you could

5    probably look at them and agree to them.  These are all things

6    that you will have to go through in the pretrial -- not the

7    pretrial conference.

8          The meeting before you prepare your pretrial

9    stipulation where you are listing your exhibit list and you

10   have to describe whether you object based on authenticity if

11   these are all going to be exhibits.

12         MR. FRIEDMAN:  Your Honor, if I may, because I don't

13   want to have to do this again, but if we could just look at

14   some of these admissions, you could see some of the problems

15   that I may have going forward.

16         Let's look at the first one.  Admit the document is

17   the document that the Plaintiff requested and, therefore, are

18   what they are purported to be.

19         This is gibberish.  That is not an answer that can be

20   responded to.  The second one is another great example.

21         Admit the document was made at or near the time.  What

22   time?  I mean, that's all it says.

23         And from information transmitted by someone with

24   knowledge.  Knowledge of what?  At what time?  I don't know how

25   I can answer any of these.

1          THE COURT:  Here's what I am going to do.

2          And basically, I am holding in abeyance the responses

3    to the requests for admissions.  I am requiring the parties to

4    meet in person and determine whether Defendant has any

5    objection to the documents based on authenticity, or the use as

6    business records under the applicable hearsay exception.

7          If the Defendant agrees that the documents are

8    admissible at trial, there is no need to answer the requests

9    for admissions because I think that will accomplish the purpose

10   that I saw.

11         Is that correct, Mr. Hayashi?

12         MR. HAYASHI:  That's absolutely correct, Your Honor.

13         THE COURT:  Okay.  If the Defendant does not agree

14   that the document is admissible, absent some reason, you know,

15   that I can't fathom at this point, the requests for admissions

16   should be answered.

17         Okay.  If there is a reason you should not answer

18   based on that guidance, then, you can either, you know, then,

19   you can respond as such.  And then, I will hear any dispute and

20   you can file a motion.

21         And the briefing schedule that I am setting for any

22   motions that need to be filed is I want a -- if a motion is

23   filed I want a response in seven calendar days and a reply in

24   seven calendar days.  That will be an expedited briefing

25   schedule.

1          MR. HAYASHI:  And if I may ask, Your Honor, the rule

2    about falling on the weekends, would that still apply?

3          THE COURT:  Weekends count.  These are calendar days.

4          MR. HAYASHI:  Okay.

5          THE COURT:  We're at the end of discovery.

6          MR. HAYASHI:  Okay.

7          THE COURT:  Seven calendar days.

8          That includes calendar days includes weekends.  If I

9    meant to exclude weekends and holidays I would say business

10   days.

11         MR. HAYASHI:  I apologize, Your Honor.

12         I meant to ask, for example, if the last day, the

13   fifth day of a reply falls on a Saturday, does that mean the

14   response is due on Monday, or it is due on Saturday?

15         THE COURT:  Then the rule regarding falling on the

16   holiday applies and the response is due on the next business

17   day.

18         MR. HAYASHI:  Thank you, Your Honor.  That was my

19   question.

20         THE COURT:  Okay.  And that way at least the issue

21   will get before me on that.

22         And I understand that, you know, this is something

23   that would normally occur at, you know, your meeting to prepare

24   your pretrial stipulation, but in any event -- and I will also

25   say that I think that, you know, as you point out these

1   requests for admissions are frequently difficult to understand.

2   They are worded in kind of an obscure fashion and I understand

3   that.

4        So what I would just say is that if you are responding

5   to something and you are confused about what it means, you can

6   talk about it.  And I understand that there are a huge number

7   of requests for admissions, far more than is usually seen, but

8   it is pretty much document by document.

9        There are some that are clearly inappropriate.  Like,

10  129, admit that all the documents contained in responses that

11  you have not yet made.  I mean, that one is not appropriate

12  because you cannot ask for admissions with respect to document

13  production that has not yet been made.

14       And so any of the requests for admissions, re:

15  documents not yet produced are stricken.  I mean, you just

16  can't do that.  You can't.  And again, this is all -- most of

17  them look like they go to issues regarding business records and

18  authenticity.

19       And so, you know, with respect to your fourth request

20  or your fifth request for production of documents, I will hear

21  you on it, Mr. Hayashi, but I think this case is overkill.  I

22  think you have requested far more in view of a fishing

23  expedition than what is appropriate.

24       But I don't feel comfortable just arbitrarily saying

25  at this point you can't propound, you know, any number of

1 requests for production.  There is no specific objection, but

2 in light of what is at stake in this case, what I am going to

3 do is -- in other words, I think an after-the-fact limitation

4 is not necessarily a good thing, but I do think your requests

5 are overbroad and disproportionate to the needs of the case,

6 from what I have seen, and you are grasping at straws.

7          And so, you know, I need to find a way to narrow it.

8 And so I have required -- and I will just go through them.  I

9 have required a response to number 1, which is the document

10 that indicates the model number of the refrigeration equipment.

11         And I am not sure what number 2 means, so I am not

12 going -- it's a document or documents that indicate the make,

13 model, type and that otherwise indicate the kind of equipment

14 that the refrigeration equipment is for the ice rink at issue

15 in Plaintiff's incident.

16         That's incomprehensible to me.  You are getting the

17 document that indicates the model number of the refrigeration

18 equipment for the ice rink at issue.

19         I think I previously required or said you should make

20 a request for all documents that indicate how the equipment was

21 maintained, inspected, repaired, and stored.

22         I am not sure what that means, but I did say

23 maintenance logs would be required and that I expected that the

24 maintenance logs would be with the refrigeration equipment.

25         And so number 3 is okay.  And that's actually what you

1  have on number 5.  These are duplicative in large request, you

2  know, it seems to me.

3          Mr. Friedman?

4          MR. FRIEDMAN:  A timeframe, Your Honor?

5          They're asking for five years worth of logs.  That

6  seems overbroad to me.

7          THE COURT:  For refrigeration equipment?

8          MR. FRIEDMAN:  Correct.

9          THE COURT:  Okay.  I will limit that to three years.

10         I am not giving a personnel file for all crew members

11 responsible.  I think that is overbroad.

12         There is nothing that indicates any problem with the

13 refrigeration equipment that I can see in this case.

14         What were the prior requests for production?  I mean,

15 you had 63 prior requests for --

16         MR. FRIEDMAN:  I think it was 68, actually.

17         THE COURT:  You had 68 prior requests for production

18 and now you are adding an additional 21.  I mean, I guess maybe

19 the best way of doing this is to just say that I am giving you

20 ten additional requests for production.

21         I think in a case like this, the number of requests

22 for production is just way overbroad.  I think if I give you

23 ten additional requests for production, plus 1, 3 and 5 won't

24 count because I am giving you those based upon the failure to

25 communicate in decisions regarding the inspection of the ship.

1        MR. FRIEDMAN:  So he can --

2        THE COURT:  So he can pick ten more.

3        And you can object on an individual basis, but in

4   terms of all of these, I think they're redundant.  I think they

5   are overkill.  I think that has been a trend throughout this

6   case.  And you know, the ship's position log at the time of the

7   incident.  I mean, I am not sure, if you want it -- you know,

8   if you want it, that's fine, but I am just --

9        MR. FRIEDMAN:  And if I may, Your Honor, that's a

10  perfect example.  The deck log has already been produced.

11       THE COURT:  So you need to look at what you've got and

12  what you need and you get ten more requests and that's it, end

13  of story.  And that would be it anyway because you don't have

14  time to propound anything else before the close of this

15  discovery.  So pick your best ten.

16       MR. HAYASHI:  Yes.  If I may just briefly.

17       One reason why there is a lot of requests is that

18  between the first and fourth request for production, the second

19  and third, Defendant didn't produce any documents.  So there is

20  actually a lot less responded to requests than it seems.

21       THE COURT:  Well, you know, it is your choice.

22       I mean, there is a limit.  You know, the reason that

23  the rules have a limit on the interrogatories is because people

24  ran amuck on their interrogatory requests.  And they were

25  propounding, you know, hundreds of interrogatory requests in

1   cases.  And the Courts said, no, that's too much.  You can

2   limit it to 25.

3          So now what is happening is, instead of propounding

4   what would normally be interrogatory requests, they have been

5   converted to requests for production.

6          And so because there is no limit on request for

7   production.  And I can't think of any scenario on a case such

8   as this, which involves a relatively discreet incident where

9   you would need to propound 68 and 21; 79 requests for

10  production.

11         And I am giving you -- no, excuse me.  It would be 89

12  requests for production.  And I am essentially giving you 68

13  and 3 is 71 and 10, I am giving you 81.  A total of 81.  You

14  need to plan your discovery better because there comes a point

15  when it is simply harassing.  And if there is something that

16  you really, really need you should be able to get it by

17  selecting which of these ten requests you want.

18         As I went through it the relevant information is

19  perhaps contained in one and you've got four requests that go

20  all around that relevant information.

21         MR. HAYASHI:  Understood, Your Honor.

22         THE COURT:  And if you think that you pick your ten

23  and you think there is one more that you really, really need,

24  you can file a motion.  And you can explain why you really,

25  really need it and, you know --

1      MR. FRIEDMAN:  In terms of timing, Your Honor, when do

2  they need to let us know the ten and how many days do we have

3  to respond?

4      THE COURT:  They can let you know the ten whenever

5  they want to let you know the ten and your response will be two

6  weeks after they provide the ten RFPs.

7      If you want me to give them a deadline I will.  I will

8  give you one week.  That way we will make sure we have a

9  definite end to discovery.  You have one week to identify the

10 ones that you want.

11      And so that would be by October the 18th and, then,

12 you have two weeks after October the 18th to respond.  And that

13 is an example of my discretion to extend the discovery

14 deadline.

15      MR. HAYASHI:  Understood, Your Honor.

16      THE COURT:  And the ten additional ones are in

17 addition to 1, 3, and 5 which I am giving you because of the

18 failed inspection issue.

19      Okay.  And I think that takes care of Defendant's

20 notice of hearing.

21      Is that correct, Mr. Friedman?

22      MR. FRIEDMAN:  Yes, Your Honor.

23      THE COURT:  And now, with respect to Plaintiff's

24 notice of hearing, I think we've got the corporate

25 representative deposition is the issue that is left.

1          I will let you go through a couple of them and you can

2    point me to the deposition and where it is and why you think

3    she was inappropriate.  And the rest of them you can file a

4    motion and explain why you think that she was not sufficiently

5    prepared.

6          And I am not sure if I have the notice, the corporate

7    representative's notice.  I don't know that that was provided

8    as source materials.

9          MR. HAYASHI:  You are absolutely correct, Your Honor.

10         And I apologize.  I sent an e-mail before this hearing

11   letting you know that that was inadvertently not included.

12         THE COURT:  Of course, I have been in court all

13   morning.

14         MR. HAYASHI:  Understood.

15         However, I will note that the attorney who prepared

16   this notice very thoughtfully included the exact language from

17   the notice of deposition.  So all of the information should be

18   between the deposition and the notice, but for the record,

19   we --

20         THE COURT:  Well, part of it is, one of the things

21   that I look at in determining whether a corporate

22   representative's responses were adequate or not, I look at the

23   scope of what the corporate representative was requested to be

24   prepared for.

25         So if you list a hundred topics for a corporate

1  representative to be prepared for, that is generally

2  unreasonable.  And so, I don't know if that happened here or

3  not, but that's why I like the whole notice of deposition.

4          MR. FRIEDMAN:  Your Honor --

5          THE COURT:  So I could look at what was requested and

6  what could reasonably be expected of a corporate representative

7  under these circumstances and then whether another deposition

8  should be ordered under the circumstances.

9          MR. FRIEDMAN:  Your Honor, I would be happy to share

10  my copy.

11          THE COURT:  Does it have notes on it?

12          MR. FRIEDMAN:  No.

13          THE COURT:  Okay.

14          MR. FRIEDMAN:  May I approach?

15          THE COURT:  Yes.

16          MR. HAYASHI:  Second re-notice.

17          THE COURT:  Okay.  Let me take a look.

18          Okay.  So pick your one area and, then, I am going to

19  need to recess.  And for the rest of it I am going to require

20  that you file a brief.

21          File a motion within seven days.  They will have five

22  days to respond.  You will have three days to reply and you can

23  explain in that where it was that she was deficient in --

24          MR. FRIEDMAN:  Your Honor, if I may?

25          THE COURT:  Yes.

1         MR. FRIEDMAN:  You had previously said you wanted the

2   schedule to be seven days for responses and you just said five.

3   So I am happy to do it either way but --

4         THE COURT:  Yes, that is right.  Response in seven

5   days and reply in five.

6         MR. FRIEDMAN:  Okay.

7         THE COURT:  And the motion, I want the motion in seven

8   days on this issue.  Response in seven days and reply in five

9   days and that's regarding the corporate representative

10  deposition.

11         Now, a lot of things that you might want a corporate

12  representative to be prepared for are really things that are

13  better requested in requests for production and in documents

14  because one person could not reasonably be required to have all

15  of the knowledge but, in any event, why don't you pick what you

16  want me to rule on, Mr. Hayashi.

17         MR. HAYASHI:  Well, if I may, Your Honor, for

18  simplicity sake, Plaintiff would not object to simply putting

19  it all in the motion.  We could imagine that it might get

20  confusing if there was some issue addressed here at the hearing

21  and omitted in the motion, but if you want us to address it now

22  we have no objection to that.

23         THE COURT:  Well, I want to get an idea of what you're

24  looking at.

25         MR. HAYASHI:  Okay.

1       THE COURT:  Well, I guess you can put it all in the

2   motion if you want and, then, he can respond and you can

3   explain to me what you thought she should know that she didn't

4   know.  And then, the Defendant can explain why it was that she

5   shouldn't have been required to be prepared on that topic.

6       MR. FRIEDMAN:  If I may, Your Honor?

7       THE COURT:  Yes.

8       MR. FRIEDMAN:  Just so you have a gist, they actually

9   provided to me after the deposition a list of 25 questions that

10  they felt the witness wasn't prepared for and why it justified

11  a second deposition.

12       To give you an example of the type of things they did,

13  they complained that the witness did not know the exact

14  humidity numbers in the room on the day of the incident and did

15  not have a measurement of the exact thickness of the ice.

16       They complained that the witness did not know the

17  exact count of how many people had utilized this ice skating

18  rink within a 12-month calendar year.

19       They complained that she did not know the exact dates

20  when these specific pair of skates had been sharpened last.

21       A number of discussions concerned prior incidents.

22  And this, Your Honor, if you recall, you entered an order for

23  us to provide those prior incidents which we did.  The

24  deposition was noticed for before that discovery was due.

25       I contacted opposing counsel and said, why don't we

```
 1  wait on the corporate rep until after the discovery comes due
 2  because you are going to ask her questions that we won't have
 3  the answers for yet.  And they said, no, we will go forward and
 4  we will deal with the Court at a later date.
 5          THE COURT:  Okay.
 6          MR. HAYASHI:  If I may, Your Honor?
 7          THE COURT:  Okay.
 8          MR. HAYASHI:  At the time the expert disclosure was
 9  just days away from when the corporate representative was
10  noticed.  So just to put that out there.
11          THE COURT:  Well, whatever your reasons are, you can
12  put all of this in your motion.  You can put that in response.
13  You can attach your list of questions as an exhibit to your
14  response if you want me to consider them.
15          MR. FRIEDMAN:  Okay.
16          THE COURT:  And some things are unknowable.
17          I mean, there are certain things that there is nobody
18  who knows and can't be found out.  And I don't know if that's
19  the case for anything or not, or whether it's a situation where
20  it's an undue burden.
21          The other thing that I always suggest to everybody is
22  when you are talking about insufficient answers at a corporate
23  representative's deposition, sometimes you might want to
24  consider whether to supplement the deposition with an affidavit
25  that answers the basic questions that can be answered and
```

1  sometimes that resolves the issue without the need of a second

2  corporate representative's deposition.

3       And I will tell you that, in general, I find that is

4  sufficient.  Even though I know it deprives the Plaintiff the

5  ability to follow up and ask followup questions and so forth,

6  sometimes I think followup questions are necessary.  And I

7  require a second deposition, but frequently I don't and

8  frequently I don't with regard to specific issues.

9       MR. FRIEDMAN:  We did offer to answer a number of

10  these questions in interrogatory form and Plaintiff was not

11  interested in that.

12       THE COURT:  And that is something that you can discuss

13  in filing your motion.

14       MR. HAYASHI:  I thought for some of them we did agree.

15  I thought I saw an e-mail.

16       THE COURT:  You need to figure that out.

17       I am just telling you that in general when I find a

18  corporate representative's deposition is insufficient, I

19  require the answers to be in interrogatory form by the

20  corporate representative.  And then, if that is not sufficient

21  the Plaintiff can seek a second deposition.

22       There are some matters that are simply not answerable

23  as to which there is an objection that can't be resolved

24  because the Defendant will not answer those questions.

25       You know, you're at the end of your discovery period.

1  I know there was a brief interruption due to Hurricane Irma,

2  which was maybe not so brief as to some people.  It certainly

3  wasn't that brief as to the Court, but in any event.  And I

4  know that that has disrupted things to some extent, but you are

5  at the end of your discovery.  You have limited ability to do a

6  followup on answers to questions in any event, but I do

7  understand that, you know, there may be things that you need.

8        And then, there are times, Mr. Hayashi, when you might

9  not get everything that you want, but recognizing that your

10  expert deadlines are approaching, you might want to take what

11  you can get in time to meet whatever deadlines there are.  And

12  I don't know if those are deadlines that have passed or not

13  passed at this point.

14        MR. HAYASHI:  Yes -- well, the expert disclosure

15  deadline has passed, Your Honor.

16        THE COURT:  Okay.

17        MR. HAYASHI:  And I understand and thank you very much

18  for that wisdom.

19        THE COURT:  So sometimes expedience is a way to go and

20  other times it is not.  I mean, it just depends on what it is

21  you are fighting about, but I am just giving you the benefit of

22  what I generally do.

23        And you know, you can't get everything three ways from

24  Sunday.  You know, you sometimes have to take your best route.

25  So, as I said, I will consider your motion, you know, whatever

1    motions you have to file with respect to any of these.

2             Thank you.

3             MR. HAYASHI:  Absolutely.

4             And I meant expert disclosure.  I apologize if I said

5    expert discovery, but in any case.

6             THE COURT:  Right.

7             MR. HAYASHI:  Thank you, Your Honor.

8             THE COURT:  Okay.  Thank you.  We will be in recess.

9             (Thereupon, the proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              CERTIFICATE

3

4         I hereby certify that the foregoing transcript is an

5    accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10
     12/05/17                        Bonnie Joy Lewis,
11                            Registered Professional Reporter
                                CASE LAW REPORTING, INC.
12                              7001 Southwest 13 Street,
                              Pembroke Pines, Florida 33023
13                                  954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25